1  MARGARET A. MCLETCHIE, Nevada Bar No. 10931
2  ALINA M. SHELL, Nevada Bar No. 11711
   MCLETCHIE LAW
3  701 East Bridger Avenue, Suite 520
   Las Vegas, NV 89101
4  Telephone: (702) 728-5300
   Email: maggie@nvlitigation.com
5  *Counsel for Plaintiff Mary Benson*

6



7            **UNITED STATES DISTRICT COURT**
              **DISTRICT OF NEVADA**
8
   MARY BENSON, an individual,           | Case. No.: 2:19-cv-01949-RFB-VCF
9
                      Plaintiff,          | **FIRST AMENDED COMPLAINT**
10
             vs.                          | **[JURY TRIAL DEMANDED]**
11
   LAS VEGAS METROPOLITAN POLICE          | **(Exemption From Arbitration Based**
12 DEPARTMENT, in its official capacity; and | **on Amount Sought, Public Policy**
   BRET EMPEY, in his official capacity as a | **(Federal Statute), and Injunctive**
13 Sergeant of the Las Vegas Metropolitan  | **Relief Sought)**
   Police Department, and as an individual,
14
15                   Defendants.

16        Plaintiff Mary Benson, by and through her counsel of record, hereby files this First

17 Amended Complaint for damages pursuant to 42 U.S.C. § 2000e to 2000e-17 (employment

18 discrimination based on race, religion and/or gender), 28 U.S.C. § 1331 (federal question

19 jurisdiction), 28 U.S.C. § 1367(a) (supplemental jurisdiction), and 28 U.S.C. § 2201 (creation

20 of remedy).

21                        **NATURE OF THE ACTION**

22        Plaintiff Mary Benson was first hired as a Law Enforcement Support Technician

23 with the Las Vegas Metropolitan Police Department in 1996 and was an exemplary employee

24 for over two decades. Beginning in 2016, Ms. Benson was subjected to pervasive and

25 repeated harassment by her supervisor, Sergeant Bret Empey. On multiple occasions at work,

26 Sgt. Empey made unwanted advances toward Ms. Benson, and made vulgar, demeaning,

27 misogynistic and objectifying remarks to Ms. Benson. On occasion, the harassment would

28 turn physical, as Sgt. Empey would invade Ms. Benson's personal space and exhibit erratic

                                    1

and threatening behaviors that made Ms. Benson fear for her safety at work. Furthermore, Ms. Benson was discriminated against based on her religion, and retaliated against when she served as an employee witness in various investigations into Sgt. Empey's conduct.

As a result of the hostile working environment created by her employer and her supervisor, Ms. Benson suffered extreme emotional distress. Eventually, Ms. Benson was forced out of her position, suffering not only the economic damages of losing her livelihood, but also losing benefits (such as health insurance and increased pension) that she would have been eligible for had she not been constructively discharged.

Both federal and state law mandate that employers maintain a safe work environment free of discrimination and harassment. Metro failed to do so in this instance, allowing a sergeant to humiliate and degrade his only female, non-Mormon employee, then retaliating against her when she stood up for herself. Now, Ms. Benson files the instant complaint to seek redress.

## JURISDICTION AND VENUE

1.      In filing this civil action, Ms. Benson seeks damages and injunctive relief under state and federal anti-discrimination statutes.

2.      Ms. Benson is a resident of Clark County, Nevada, and asserts statutory claims arising under Nevada anti-discrimination statutes, Nev. Rev. Stat. § 613.330 *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended ("Title VII").

3.      Ms. Benson seeks injunctive and declaratory relief, damages, and other appropriate legal and equitable remedies pursuant to Nev. Rev. Stat. § 613.330 *et seq.*, and Title VII.

4.      Jurisdiction is proper in this case pursuant to Nev. Rev. Stat. § 14.065.

5.      Because Defendants are not arms of the State, this suit is not barred by the Eleventh Amendment to the United States Constitution. *See Eason v. Clark County Cty. Sch. Dist.*, 303 F.3d 1137, 1147 (9th Cir. 2002); *Culinary Workers Union v. Del Papa*, 200 F.3d 614, 619 (9th Cir. 1999).

**CONDITIONS PRECEDENT TO SUE UNDER TITLE VII AND NEV. REV. STAT. § 613.330**

6. In or around January 2018, Ms. Benson completed an intake form with the Nevada Equal Rights Commission ("NERC").

7. On or around February 4, 2018, Ms. Benson completed an intake inquiry form with the United States Equal Opportunity Commission ("EEOC").

8. On May 17, 2018 Ms. Benson digitally signed an EEOC charge alleging discrimination based on sex and religion, as well as retaliation.

9. On March 29, 2019, the EEOC issued Ms. Benson a notice of her right to file suit, indicating that she had fulfilled the administrative requirements and waited the appropriate amount of time before filing suit.

10. This lawsuit has been filed within the ninety (90) days after Ms. Benson received the aforementioned EEOC notice of her right to sue.

11. Thus, Ms. Benson has properly exhausted her administrative remedies and is entitled to file this suit under Title VII and Nev. Rev. Stat. § 613.330.

**PARTIES**

12. During all relevant times herein, Plaintiff Mary Benson ("Ms. Benson") was and is a resident of Clark County, Nevada.

13. Defendant Las Vegas Metropolitan Police Department ("Metro") is the law enforcement agency for Clark County and the City of Las Vegas. Defendant Metro is sued in its official capacity.

14. Metro qualifies as an "employer" subject to Title VII and Nev. Rev. Stat. § 613.310 *et seq.* Upon information and belief, Metro employs more than 5,000 individuals.

15. At all relevant times herein, Ms. Benson was employed by Metro as a Law Enforcement Support Technician ("LEST") assigned to Northeast 51, Overton Substation.

16. Defendant Bret Empey ("Sgt. Empey") is a sergeant with the Las Vegas Metropolitan Police Department, and at all relevant times herein was assigned to Northeast 51, Overton Substation.

MCLETCHIE LAW
ATTORNEYS AT LAW
701 EAST BRIDGER AVE., SUITE 520
LAS VEGAS, NV 89101
(702) 728-5300 (T) / (702) 425-8220 (F)
WWW.NVLITIGATION.COM

17.     The naming of defendants herein is based upon information and belief. Ms. Benson reserves her right to name additional defendants and modify her allegations concerning defendants named herein.

**STANDING**

18.     Ms. Benson is and continues to be directly affected by Defendants' practices and policies of sexual harassment, gender- and religion-based discrimination, and retaliation.

19.     An actual case and controversy exists between Ms. Benson and Defendants concerning their respective rights, privileges, and obligations.

**FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS**

*Plaintiff Mary Benson*

20.     Ms. Benson was first employed by Metro as a Law Enforcement Support Technician in 1996.

*The Overton Substation*

21.     Ms. Benson was assigned to Northeast 51, Overton Substation (the "Substation"), located in Overton, Nevada since approximately 2003.

22.     Generally, all employees at the Substation are and have been members of the Church of Jesus Christ of Latter-day Saints ("LDS" or "Mormon").

23.     At the relevant times herein, Ms. Benson was the only female employee of the eleven employees assigned to the Substation.

24.     At the relevant times herein, Ms. Benson and her husband, Officer Troy Benson ("Officer Benson"), were the only two employees assigned to the Substation who were not LDS.

25.     Upon information and belief, Sgt. Empey became Ms. Benson's supervisor in or around 2007.

26.     Upon information and belief, several of the officers who are assigned to the Substation, including but not limited to Officer Nathan Boss, Officer Otto Foster, and Officer Corey Estes, are close associates of Sgt. Empey.

/ / /

MCLETCHIE LAW
ATTORNEYS AT LAW
701 EAST BRIDGER AVE., SUITE 520
LAS VEGAS, NV 89101
(702) 728-5300 (T) / (702) 425-8220 (F)
WWW.NVLITIGATION.COM

4

27.     Upon information and belief, Sgt. Empey has used his position of authority at the Substation to bully officers with whom he has had disagreements.

28.     Upon information and belief, Sgt. Empey's bullying behavior contributed to several officers leaving the substation, including Officers Allen Johnson, Daniel Swanson, and Jeffrey Hutchinson.

29.     Upon information and belief, Sgt. Empey has been the subject of prior internal investigations related to his bullying behavior, including of Officers Allen Johnson and Shanan Kelly.

30.     Despite these differences, prior to June 2016, Ms. Benson enjoyed a productive and professional working relationship with Sgt. Empey and the other Metro employees assigned to the Substation.

***Ms. Benson's Appearance Changes and Sgt. Empey Takes Notice***

31.     In 2015 through the beginning of 2016, Ms. Benson lost a significant amount of weight.

32.     On or about May 23, 2016, Ms. Benson underwent an abdominoplasty and breast augmentation surgery.

33.     Following this surgery, Ms. Benson was on leave pursuant to the Family Medical Leave Act ("FMLA") until returning to work on June 6, 2016.

34.     On or about June 7, 2016, as Ms. Benson was walking out of Sgt. Empey's office, he beckoned her back, saying, "wait a minute, come back in here." When Ms. Benson returned, Sgt. Empey looked her up-and-down in a sexual manner and told her something to the effect of, "alright, turn around you can walk back out."

35.     Sgt. Empey's remarks implied that he called Ms. Benson back to his office for the sole purpose of leering at her body.

36.     The next day, on June 8, 2016, Ms. Benson was in the office conducting fingerprints when Sgt. Empey walked by. Sgt. Empey noticeably did a "double-take," impliedly expressing surprise and attraction at her appearance, before leaving.

/ / /

37.     Upon his return, Sgt. Empey told Ms. Benson, referring to her weight loss, plastic surgery, and a recent haircut, "I know I don't have a say in this, but when is enough change gonna be enough for you?"

38.     On several different occasions starting in June 2016, Sgt. Empey would routinely visit Ms. Benson's office to talk to her about business, sitting in a chair directly across from her desk. During these visits, Sgt. Empey would tug and grab at his genitals through his pants, rearranging them with full knowledge that Ms. Benson was looking directly at him and was not in a position to avert her eyes from this display.

39.     On the afternoon of July 18, 2016, Ms. Benson went to Sgt. Empey's office to tell him that she was leaving briefly because she was (figuratively) starving and had not brought a lunch with her to work. Empey first responded, "Yeah, we know you're starving, look at you"—a clear reference to Ms. Benson's recent weight loss. Sgt. Empey then said, "Enjoy the heat." When Ms. Benson responded that she did not enjoy being hot, Sgt. Empey stated "Yeah, well you should have thought about that before you had all this work done."

40.     Sgt. Empey's unwanted, objectifying behavior and remarks made Ms. Benson extremely uncomfortable and angry.

**Sgt. Empey Repeatedly Makes Offensive Remarks to and About Ms. Benson.**

41.     On or about June 9, 2016, Sgt. Empey initiated a conversation about sex offenders with Ms. Benson.

42.     Ms. Benson explained that sex offenders had been coming to the substation complaining that they needed to verify their information quarterly instead of annually.

43.     Unprovoked, Sgt. Empey said, "I wish they would complain to me, because I would tell them that I'm not the one that stuck my dick where it didn't belong."

44.     This outburst made Ms. Benson uncomfortable and she attempted to change the subject and return the conversation to a more professional tone. However, Sgt. Empey continued, saying, "they're the ones sticking their dicks where they don't belong."

45.     On or about July 16, 2016, Ms. Benson went to Sgt. Empey's office to inform him that she was (figuratively) starving and was briefly leaving to grab lunch.

46.     Sgt. Empey did not confine his comments about Ms. Benson's perceived attractiveness to Ms. Benson. In or around July 2016, Sgt. Empey also commented on Ms. Benson's appearance to her husband, Officer Benson, telling him that "If she gets any hotter, you're out."

47.     On or about July 27, 2016, Sgt. Empey said to Ms. Benson, in reference to her keeping a space heater underneath her desk, "you lost all that weight and you lost your damn mind."

48.     In addition to the aforementioned inappropriate comments regarding Ms. Benson's looks, Sgt. Empey would often contrast Ms. Benson with his own wife, whom he would disparage regarding her weight.

49.     At one point between the end of December 2016 and January 2017, a new officer was to be assigned to the Substation. Sgt. Empey and Ms. Benson engaged in conversation about having "new blood" in the office, and Ms. Benson referenced bullying that had happened at the substation in the past, expressing hope that it would not happen again.

50.     In response, Sgt. Empey argued that bullying was good and builds character. When Ms. Benson disagreed, noting that it had created issues in the past, Sgt. Empey replied, "I'm not talking about sticking a dick up someone's ass."

51.     On January 19, 2017, Ms. Benson received her performance report from Sgt. Empey. In this report, Sgt. Empey stated, "This year you achieved some very lofty goals in the area of personal health and fitness. Without putting too fine of a point on it – Way to Go! And keep up the great work."

52.     This was the first time in her employment with Metro that Ms. Benson received any comment on her physical appearance in her evaluation, as her job does not have any physical requirements. Although this remark was couched as a compliment, Ms. Benson interpreted it as objectifying and degrading, as it was wholly unrelated to her performance as a LEST.

/ / /

7

53.     On or about February 28, 2017, a female civilian came to the substation to request a Battery Domestic Violence ("BDV") report pertaining to a crime she had been victim of the night before.

54.     Sgt. Empey noticed the civilian's presence at Ms. Benson's service window—when she left, he asked why she was there.

55.     Upon information and belief, Sgt. Empey is a friend of the father of the suspect in the civilian's aforementioned battery domestic violence case.

56.     Ms. Benson responded that she was there to obtain a copy of her BDV report. Sgt. Empey began a misogynistic, victim-blaming tirade against the civilian, saying something to the effect of: "This is the kind of stuff that pisses me off. You have someone out there throwing their snatch around and now claiming they're a victim."

57.     On or about August 16, 2017, a new Bureau of Land Management (BLM) officer known as "Dave" was present at briefing with his police dog. When Ms. Benson joined the briefing to introduce herself to "Dave," Sgt. Empey remarked, "she's just here for her looks."

58.     This denigrating remark made Ms. Benson feel extremely embarrassed, as it implied that Ms. Benson was a sub-par employee when in fact the opposite was true.

59.     In sum, Sgt. Empey's repeated harassing remarks and conduct based on Ms. Benson's sex contributed to creating a toxic environment from which Ms. Benson was essentially forced out.

### Ms. Benson is Discriminated Against for Not Being Mormon.

60.     While working under the supervision of Sgt. Empey, Ms. Benson was subjected to repeated attempts to convert her to the Mormon faith from Sgt. Empey and other officers.

61.     As part of his efforts to draw Ms. Benson into his faith Sgt. Empey often called Ms. Benson a "dry Mormon" who "hadn't been dunked yet," *i.e.* that she lived a "Mormon lifestyle" but had not been baptized into the church.

/ / /

MCLETCHIE LAW
ATTORNEYS AT LAW
701 EAST BRIDGER AVE., SUITE 520
LAS VEGAS, NV 89101
(702) 728-5300 (T) / (702) 425-8220 (F)
WWW.NVLITIGATION.COM

8

62.     In line with his sexual advances, Sgt. Empey told Ms. Benson that if anything ever happened to her husband that she would become a "Sister wife."

63.     In addition to making conversion attempts, Sgt. Empey regularly mocked Ms. Benson's Catholic church, calling it the "Taco Bell" church—a reference to the church's colors and the fact that Catholicism plays a prominent role in Mexican and Latin-American culture.

64.     During squad and community events, Sgt. Empey regularly mandated participation in LDS prayers.

65.     Sgt. Empey and other LDS Officers regularly told Ms. Benson and Officer Benson that they were "not worthy" because they were not baptized members of the LDS Church. For example, on or about December 4, 2016, Ms. Benson and Officer Benson attended the baptism of a friend's child at an LDS church. As Ms. Benson and her husband were walking through the church parking lot after the baptism, Sgt. Empey—who was on duty—pulled into the parking lot in his patrol vehicle and asked "What the fuck are you doing here? You're not members."

66.     In sum, Sgt. Empey's repeated denigrating remarks and disrespectful conduct based on Ms. Benson's religion contributed to creating a toxic environment from which Ms. Benson was essentially forced out.

**_Ms. Benson Serves as a Witness and Sgt. Empey Mounts a Retaliation Campaign._**

67.     On or about May 8, 2017, Ms. Benson was contacted by Detective Sam Bonner of Metro's Office of Diversity to be a Witness Employee in an internal investigation pertaining to an Americans with Disabilities Act (ADA) complaint filed against Sgt. Empey by her husband, Officer Benson.

68.     Ms. Benson gave this interview on May 18, 2017.

69.     During this interview, Ms. Benson disclosed many of the incidents of sexual harassment that form the basis of the instant complaint. Additionally, she expressed her fears that Sgt. Empey would retaliate against her for participating as an Employee Witness.

/ / /

9

70.     After Sgt. Empey learned that Ms. Benson gave this interview, his behavior became increasingly threatening and erratic.

71.     On May 23, 2017, Ms. Benson arrived at the substation to find Sgt. Empey sitting outside the front door, staring at her and scowling, watching her every move.

72.     On May 24, 2017, Sgt. Empey briefly moved a large file cabinet from its location of five years to directly in front of the rear exit door, blocking it. This "barring the door" made Ms. Benson feel threatened, intimidated, and trapped.

73.     Beginning on July 19, 2017, Sgt. Empey repeatedly used Ms. Benson's office printer instead of his own office printer or the communal office printer. While retrieving the printed documents from Ms. Benson's printer, Sgt. Empey lingered close behind Ms. Benson, intentionally using his large frame to invade her personal space and physically intimidate her, making her extremely uncomfortable and unable to work.

74.     On or about July 5, 2017, Officer Mark Harding approached Ms. Benson at the substation and told her that he was worried about her. When Ms. Benson asked why, Officer Harding responded that he was worried because Sgt. Empey was "always watching you." Officer Harding expressed his concern about Sgt. Empey's actions and warned Ms. Benson to be careful.

75.     On or about January 2, 2018, when Ms. Benson was returning from holiday leave, Sgt. Empey entered her office to ask her about updating the substation's officers' stat sheet. As soon as Sgt. Empey entered Ms. Benson's office, Officer Cory Estes ("Officer Estes") got up from his desk and silently stood in Ms. Benson's office door with his arms crossed, blocking it. Both Sgt. Empey and Officer Estes are large men and are both over six feet tall.

76.     Ms. Benson interpreted this as Officer Estes intimidating her as retaliation for her serving as an employee witness and having an open EDS complaint against his friend, Sgt. Empey.

/ / /

/ / /

10

77.     Upon information and belief, Metro's Office of Diversity sustained Officer Benson's allegation that Sgt. Empey discriminated against him and issued Sgt. Empey a contact report.

78.     Upon information and belief, Sgt. Empey received no discipline for this misconduct other than a contact report.

79.     On or about September 20, 2017, Ms. Benson was contacted by Detective David Goris ("Det. Goris") of Metro's Internal Affairs Bureau ("IAB") to be a Witness Employee in an internal investigation pertaining to allegations made by Officer Shanan Kelly ("Officer Kelly") that Sgt. Empey was stern, condescending, and made unjustifiable demands of Officer Kelly during an August 8, 2017 meeting.

80.     Ms. Benson gave this interview on September 26, 2017.

81.     Sgt. Empey made no secret of his disapproval of Ms. Benson's participation in the interview. For instance, on October 19, 2017, Sgt. Empey abruptly changed his procedure for handling traffic citations, instructing Ms. Benson to give them to him for paperwork instead of completing the paperwork herself. When Ms. Benson asked why the procedure had changed, Sgt. Empey stated "Yeah, well that was when there was trust in this office and with everything going on there is no trust."

82.     In the months following this interview, employees at the Overton substation began a campaign of "freezing out" Ms. Benson, not only preventing Ms. Benson from performing her duties but imperiling the safety of civilians.

83.     One such incident occurred on October 23, 2017. A local citizen called the Overton substation and reported to Ms. Benson that her son was at her house when he should not be.

84.     Prior to Ms. Benson being an employee witness, non-urgent calls such as this one would result in Ms. Benson contacting an Overton substation officer via cell phone, whereupon he would investigate the situation.

/ / /

/ / /

85.     Upon information and belief, prior to Ms. Benson being an employee witness, Sgt. Empey had advised officers numerous times to always answer Ms. Benson's phone calls.

86.     In this instance, however, Ms. Benson called Officer Estes three times, all of which were ignored. Ms. Benson then called Officer Nathan Boss ("Officer Boss") three times, all of which were ignored.

87.     By the time Officer Boss replied to Ms. Benson, the situation at the citizen's home became urgent, forcing Ms. Benson to dial 911 and forward the citizen to dispatch.

88.     The next day, October 24, 2017, Ms. Benson attempted to discuss the events of October 23, 2017 with Sgt. Empey. Sgt. Empey responded with hostility and admitted to ignoring her calls, animatedly telling Ms. Benson that sometimes when she calls him in the field, he would see it was her and think, "I'll deal with this later and end the call."

89.     When Ms. Benson replied that past policy mandate that officers answer their phones and asked whether she should call Overton substation officers in case she has an emergency at work. Sgt. Empey callously replied, "that's what you have a panic button for."

90.     On November 1, 2017, during briefing regarding police statistics, Sgt. Empey noted that increased scrutiny of stats was not his fault, and that he was "not the one that created all these issues … when you work in an area like this small unit some personalities are going to clash that's where we're at." Ms. Benson interpreted this remark as singling her and her husband out for filing complaints against him.

91.     On November 8, 2017, Sgt. Empey intentionally made Ms. Benson's work more difficult than necessary. Specifically, while she was performing timed training at approximately 4:00 p.m., Sgt. Empey requested that Ms. Benson compile a list of all the houses of worship in the substation's jurisdiction by the next day. Ms. Benson stayed late to complete this assignment. The next day, Ms. Benson was forwarded an email indicating that Sgt. Empey received notice On November 7, 2017 that he needed such a list by November 9, 2017, but intentionally waited until the last possible moment—right before Ms. Benson was about to leave the office—to ask Ms. Benson to compile said list.

12

92.     On November 9, 2017, Sgt. Empey displayed more intimidating "stalking" behaviors toward Ms. Benson, specifically waiting in his vehicle for Ms. Benson near the rear exit. When Ms. Benson, frightened for her safety, exited via the front door, Sgt. Empey responded by driving around the building in an aggressive and unsafe manner to pass by Ms. Benson and glare at her as she drove out of the parking lot.

93.     On November 15, 2017, Sgt. Empey handed Ms. Benson her annual evaluation. This evaluation was almost verbatim the same as her previous year's evaluation, however Sgt. Empey had removed several positive comments that were previously included. Furthermore, Sgt. Empey falsely claimed he "had to" remind Ms. Benson about completing training and failed to state that Ms. Benson completed nine additional training courses on her own initiative, without any directive.

94.     Upon information and belief, this was the first time in her career at Metro that Ms. Benson had ever received a negative annual evaluation.

95.     Beginning on November 21, 2017, Sgt. Empey and his most trusted officers, Officers Boss and Estes, would intentionally whisper to each other when around Ms. Benson, indicating their lack of trust, and intentionally making it more difficult for Ms. Benson to perform her duties. Notably, when Sgt. Empey was not in the office, Officers Boss and Estes spoke at a normal volume.

96.     That same day, on November 21, 2017, Ms. Benson received a callout payment request from Officer Boss for a prisoner transport. Ms. Benson processed this callout for payroll in the same manner she had for the previous 15 years, and informed Officer Boss that there were discrepancies and errors in the documents he had submitted. This resulted in Sgt. Empey, Officer Boss, and Officer Estes leaving the room and conferring with each other in private, intentionally excluding Ms. Benson. Sgt. Empey did not provide any further direction regarding the callout.

97.     The stress of this incident caused Ms. Benson to suffer a migraine headache and leave the office that day.

/ / /

98.     On November 23, 2017, Ms. Benson received a rude, condescending email from Sgt. Empey—carbon copied to Lt. Stuart—chastising her for pointing out the discrepancies in Officer Boss's callout, and that she was "doing something outside of her normal scope," even though she had routinely performed payroll and callout processing duties for the previous 15 years.

99.     On December 5, 2017, Ms. Benson sent a text message to Sgt. Empey informing him that she would be out pursuant to FMLA for migraine headaches. In stark contrast with the quick responses she had received in the past 10 years of working with Sgt. Empey, Ms. Benson got no response. Forty minutes later, she sent another text to Sgt. Empey, to which he did not respond. Approximately two hours later, Ms. Benson checked her unit's google calendar and observed that her requested leave had already been entered into the calendar by Sgt. Empey. This evidences that Sgt. Empey intentionally made Ms. Benson's job more stressful and difficult by failing to inform her whether he had decided to approve her leave.

100.    On December 11, 2017, Ms. Benson completed an occupational injury report and placed it in Sgt. Empey's box for signatures. Sgt. Empey did not come to the substation on that day to sign any forms, so Ms. Benson emailed him on December 12, 2017, as she did not want to violate policy by not notifying her Sergeant of an injury, and also needed to fax the form to Health & Safety Detail as soon as possible. Later that day, after some delay, Sgt. Empey signed the form.

101.    Notably, under question #36 of the form—"is there any reason to doubt the validity of the claim?"—Sgt. Empey checked neither the "yes" nor the "no" box, but wrote "Unk," presumably short for "unknown," instead.

102.    This was in stark contrast with the many times in the past—before he had any reason to retaliate against Ms. Benson—that Sgt. Empey simply checked the "no" box.

103.    Sgt. Empey did not have any reason to doubt the validity of the claim—if he did, he could have checked the "yes" box. Instead, he deliberately elided the question in a manner that he knew would be an affront to Ms. Benson—a message that he did not trust

MCLETCHIE LAW
ATTORNEYS AT LAW
701 EAST BRIDGER AVE., SUITE 520
LAS VEGAS, NV 89101
(702) 728-5300 (T) / (702) 425-8220 (F)
WWW.NVLITIGATION.COM

her—without having to outright perjure himself on the form.

104.    On December 14, 2017, Ms. Benson attended the annual court Christmas party that Metro employees have attended every year for several years. Before attending, Ms. Benson texted Sgt. Empey to ask if it would be the "normal way"—*i.e.* whether everyone would go home after the party instead of returning to the office.

105.    Instead of continuing to allow Ms. Benson to go home after the party—as he did in years past, before he had any reason to retaliate against her—Sgt. Empey responded with "back to the office." Ms. Benson obeyed that command and returned to the office after the Christmas party.

106.    On December 18, 2017, Sgt. Empey visited the substation in plain clothes, as he was on vacation. While there for a half-hour, Sgt. Empey simply ignored Ms. Benson, literally acting as if she did not exist. Thus, even while on vacation, Sgt. Empey went out of his way to display hostility and resentment toward Ms. Benson.

107.    These actions, taken together, constitute a campaign of retaliation that simply did not exist until Ms. Benson testified against Sgt. Empey.

**Sgt. Empey Invades Ms. Benson's Privacy After Auto Accident.**

108.    While on scheduled vacation on December 23, 2017, Ms. Benson was involved in a serious automobile accident that took place on State Route 169 in Clark County.

109.    The incident was under the jurisdiction of the Nevada Highway Patrol and was investigated by the Nevada Highway Patrol.

110.    As a result of injuries and acute hypertension caused by the crash, Ms. Benson was placed in an ambulance.

111.    While in the ambulance, Ms. Benson observed that Sgt. Empey had arrived at the scene in his personal vehicle, despite being on vacation. Given the recent and growing tension between them, Ms. Benson did not want to see Sgt. Empey, as the stress involved would further increase her blood pressure and be dangerous to her health.

112.    Ms. Benson instructed medical staff not to let Sgt. Empey in the ambulance.

///

MCLETCHIE LAW
ATTORNEYS AT LAW
701 EAST BRIDGER AVE., SUITE 520
LAS VEGAS, NV 89101
(702) 728-5300 (T) / (702) 425-8220 (F)
WWW.NVLITIGATION.COM

113.    As a result of speaking with NHP Officers and Officer Benson, Sgt. Empey learned about Ms. Benson's medical condition.

114.    Despite the fact that he knew or should have known that he was inappropriately and unlawfully intruding on his employee's medical care, and despite not having any permission to do so, Sgt. Empey opened the ambulance's back door and entered it.

115.    This intrusion made Ms. Benson feel extremely intimidated and uncomfortable.

116.    While in the ambulance against Ms. Benson's wishes, Sgt. Empey said, within earshot of paramedics and Officer Benson, "are those your carpal tunnel wrists?" This was in reference to a workers' compensation claim filed by Ms. Benson on December 11, 2017.

117.    Upon information and belief, Sgt. Empey is forbidden from disclosing Ms. Benson's private medical information pursuant to, *inter alia*, Metro policy.

***The Retaliation Continues After Ms. Benson Returns to Work.***

118.    When Ms. Benson returned to work on January 2, 2018, the intimidation continued. When Sgt. Empey went to Ms. Benson's office to give her a list of handwritten changes he wanted made to officers' files, Officer Estes got up from his desk and silently stood in the doorway of Ms. Benson's office, crossing his arms and glowering at Ms. Benson as he blocked the doorway.

119.    Ms. Benson believes this to be form of intimidation, as Officer Estes (who, like Sgt. Empey, is large man) had no information to convey or any other reason to be there, watching the interaction between Ms. Benson and Sgt. Empey.

120.    On January 16, 2018, Ms. Benson received an email from Sgt. Empey—carbon copied to Lt. Stuart—which abruptly pointed out a minor discrepancy in a leave slip Ms. Benson submitted for illness on January 11, 2018. Specifically, Sgt. Empey claim that her leave should have been for 7 hours instead of 6 hours because according to payroll, Ms. Benson works 10-hour shifts from 7 am to 5 pm.

121.    For the seven to eight years prior to this incident, pursuant to the customs that had been established for years at the substation under Sgt. Empey's supervision, Ms. Benson worked continuously from 7 am to 4 pm, and "saved" her 1-hour lunch break for the end of her shift, thereby working a full shift despite leaving at 4 pm.

122.    Sgt. Empey knew that Ms. Benson's—and the substation's—standard practice was for Ms. Benson to "save" her lunch break for the end of her shift, and therefore for the purposes of reporting personal leave, calculate the hours as if her shift ended at 4 pm, not 5 pm as Metro payroll technically reflects.

123.    Before Sgt. Empey had any reason to retaliate against Ms. Benson, he routinely abided by this arrangement created for the convenience of Metro employees and citizens alike. Afterward, as reflected by this incident and others, Sgt. Empey would seize upon any pretext to penalize and intimidate Ms. Benson, even down to forcing her to cede an extra hour of her leave time that she was entitled to.

124.    In the last few months before Ms. Benson was forced to resign, Sgt. Empey intentionally isolated Ms. Benson by restricting officers from interacting with Ms. Benson. During that same time period, Sgt. Empey further isolated Ms. Benson by holding the substation's weekly briefings at an offsite location rather than the substation.

***Ms. Benson Unsuccessfully Attempts to Seek Internal Remedies from Metro.***

125.    On October 19, 2017, Detective Sam Diaz ("Det. Diaz") of the Employment Diversity Section ("EDS") of Metro's Internal Affairs Bureau ("IAB") contacted Ms. Benson asking if she wanted to file a report against Sgt. Empey. Ms. Benson replied that she needed to contact her union representative first and expressed her fears that Sgt. Empey would retaliate against her if she filed a report. Ms. Benson also reported that Sgt. Empey was already targeting her for disparate treatment by being rude and nasty to her, in retaliation for her being a witness against him.

126.    On October 24, 2017, Ms. Benson again explained to Det. Diaz that she was scared to file a claim due to the retaliation that she would go through as well as the retaliation she was currently going through.

127.     On November 1, 2017, Ms. Benson was interviewed by Det. Diaz regarding her allegations about Sgt. Empey's behavior at work.

128.     On December 4, 6, and 8, 2017, Ms. Benson contacted her Police Protective Association Civilian Employees ("PPACE") union representative, Michael, via phone and email, forwarding him Sgt. Empey's abusive emails and detailing how his retaliatory behavior was causing her immense stress and negatively affecting her health.

129.     On December 19, 2017, Ms. Benson had a telephone conversation with Det. Diaz regarding her ongoing disparate treatment from Sgt. Empey. During this call, Ms. Benson broke down crying while recalling the abuse she had suffered at the hands of Sgt. Empey and his most loyal subordinates, Officers Estes and Boss.

130.     On February 14, 2018, Ms. Benson received a letter from Captain Roxanne Burke, on behalf of Sheriff Joseph Lombardo, informing her that EDS had completed its investigation of her complaint and was administratively closing its file in this matter, as EDS could not prove or disprove Ms. Benson's allegation of a violation of policy and/or federal law.

131.     Essentially, this letter meant that no disciplinary action would be taken against Sgt. Empey, despite his manifest discrimination and retaliation against Ms. Benson.

*Ms. Benson is Constructively Discharged.*

132.     Eventually, the stress of being the target of gender-based and religion-based harassment, ostracization, and retaliation became unbearable for Ms. Benson.

133.     Because Metro had displayed its unwillingness to enforce its own anti-discrimination and harassment policies, Ms. Benson was forced to make the decision to resign from her job at Metro.

134.     On March 2, 2018, Ms. Benson submitted her medical retirement paperwork—with the exception of the supervisor page—to the Public Employees' Retirement System of Nevada ("PERS").

135.     Ms. Benson did not include the supervisor page in fear of being the target of more retaliatory and discriminatory behavior from Sgt. Empey.

MCLETCHIE LAW
ATTORNEYS AT LAW
701 EAST BRIDGER AVE., SUITE 520
LAS VEGAS, NV 89101
(702) 728-5300 (T) / (702) 425-8220 (F)
WWW.NVLITIGATION.COM

*Sgt. Empey Intimidates Ms. Benson After Her Constructive Discharge*

136.   Since Ms. Benson's constructive discharge from Metro, Sgt. Empey has continued to engage in bizarre and intimidating behavior designed to harass Ms. Benson, and on information and belief, has directed others working under his supervision to likewise engage in bizarre and intimidating behavior designed to harass Ms. Benson

137.   These behaviors have invaded Ms. Benson's privacy.

138.   These behaviors have caused Ms. Benson to fear engaging in everyday activities such as driving or shopping.

139.   Upon information and belief, on at least seven occasions between August 2018 and January 2019, Ms. Benson observed Sgt. Empey intentionally following her as she was driving through the Overton/Logandale area.

140.   In February 2019, Ms. Benson encountered Sgt. Empey at a grocery store in Overton, Nevada where she was shopping with her husband. During that encounter, Sgt. Empey intentionally placed himself in close proximity to Ms. Benson and her husband and stared at her with an angry expression without speaking.

141.   Additionally, on information and belief, on two occasions since her constructive discharge, including but not limited to on or about March 2, 2019, Ms. Benson has encountered Sgt. Empey while at a local gas station. On both occasions, Sgt. Empey intentionally placed himself in close proximity to Ms. Benson where he had no reason to be, stopped, attempted to block her movement, and stared at her with an angry expression without speaking.

142.   Additionally, on or about May 4, 2018, Ms. Benson and her husband were returning home from having dinner when they encountered a man waiting on their property.

143.   The man informed Ms. Benson and her husband that he was starting a new pest control business and had been told by Officer Nathan Boss—an officer with Metro and a crony of Sgt. Empey—that the Bensons needed an exterminator.

/ / /

/ / /

MCLETCHIE LAW
ATTORNEYS AT LAW
701 EAST BRIDGER AVE., SUITE 520
LAS VEGAS, NV 89101
(702) 728-5300 (T) / (702) 425-8220 (F)
WWW.NVLITIGATION.COM

144.   Upon information and belief, Officer Boss sent the pest control service to Ms. Benson's residence to send the Bensons a message that they are "pests" and need to be exterminated.

145.   Upon information and belief, Officer Boss was acting under the direction of Sgt. Empey and/or with the tacit approval of Sgt. Empey.

146.   Additionally, on December 9, 2019, Ms. Benson and her husband went to the Logandale post office. When they arrived at the post office, they encountered Metro Officer Chris Khoentopp, an officer with whom the Bensons are friends. While Ms. Benson waited in the car, Mr. Benson got out to have a conversation with Officer Khoentopp in front of the post office.

147.   While Mr. Benson was speaking with Officer Khoentopp, Officer Otto Foster—another of Sgt. Empey's cronies—pulled into the post office parking lot in his off-duty personal vehicle.

148.   When Officer Foster exited his vehicle and began walking past Officer Khoentopp and the Bensons and into the post office, Officer Foster called Mr. Benson a "piece of shit" and flipped him off.

149.   Upon information and belief, Officer Foster engaged in this intimidating and offensive behavior with the tacit approval of Sgt. Empey and/or at his direction.

150.   On information and belief, Sgt. Empey, Officer Boss, and Officer Foster have engaged in this conduct to intimidate, harass, and punish Ms. Benson.

151.   On information and belief, Sgt. Empey and Officer Boss have engaged in this conduct to get Ms. Benson and her husband to leave the Overton/Logandale area, which Sgt. Empey thinks he controls due to his position with Metro and the isolated nature of the substation at which Sgt. Empey is the highest-ranked Metro employee.

152.   As a result of these incidents, Ms. Benson has become afraid of engaging in everyday activities. Ms. Benson has refrained and continues to refrain from driving, shopping, or dining in or around the Overton/Logandale area to prevent being followed by Sgt. Empey or otherwise being subjected to invasive, intimidating behavior by Sgt. Empey

or others acting on his behalf or with his tacit or explicit approval.

153.    As a result of these incidents, and to further avoid any contact with Sgt. Empey or other Substation officers, Ms. Benson has also ceased engaging in recreational activities that she used to enjoy such as hiking, riding all-terrain vehicles, and walking her dogs.

154.    Additionally, this pattern of invasive and intimidating conduct by Sgt. Empey and other Metro officers acting on his behalf or with his tacit or explicit approval has caused Ms. Benson and her husband to consider selling the home they custom built in 2016 and moving out of the community they have called home for approximately seventeen years.

***The Economic and Emotional Toll of Ms. Benson's Constructive Discharge***

155.    Upon information and belief, pursuant to PERS policy, after 30 years of employment with the State of Nevada, state employees are entitled to the maximum amount of pension income and benefits

156.    Ms. Benson intended on working for the full 30 years as a LEST with Metro.

157.    However, due to her constructive discharge, Ms. Benson was only able to work 20 years.

158.    As a result of her constructive discharge, Ms. Benson has lost both the salary she would have otherwise made over the next decade, as well as the difference between the lifetime PERS pension and benefits she currently entitled to and the maximum lifetime PERS pension she would have been entitled to but for her constructive discharge from Metro.

159.    Upon information and belief, the medical coverage Ms. Benson was entitled to as a Metro employee (and prospectively, as a maximum-level PERS pensioner) is significantly less expensive than private health care plans of similar quality.

160.    As a result of her constructive discharge, Ms. Benson has been forced to obtain significantly more expensive health care coverage for herself and her family.

161.    In addition to economic losses, Ms. Benson suffered severe emotional distress, including depression and anxiety, from being forced to resign from Metro.

/ / /

MCLETCHIE LAW
ATTORNEYS AT LAW
701 EAST BRIDGER AVE., SUITE 520
LAS VEGAS, NV 89101
(702) 728-5300 (T) / (702) 425-8220 (F)
WWW.NVLITIGATION.COM

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
#### DISCRIMINATION BASED ON GENDER AND RELIGION
#### PURSUANT TO 42 U.S.C. § 2000E AND NEV. REV. STAT. § 613.330
#### (AGAINST DEFENDANT METRO)

162.    Ms. Benson repeats and realleges Paragraphs 1 through 161 as though fully set forth herein

163.    As an employee of Metro, Ms. Benson is a person entitled to protection under federal and Nevada anti-discrimination statutes, respectively codified at 42 U.S.C. § 2000e *et. seq.* ("Title VII"), and Nev. Rev. Stat. § 613.330 *et. seq.*

164.    Metro had a legal obligation, pursuant to the aforementioned statutes and its own internal policies, to maintain a workplace free of unlawful discrimination.

165.    Title VII and Nev. Rev. Stat. § 613.330 *et. seq.* prohibit Metro from discriminating against an employee on the basis of that employee's gender and/or religion.

166.    Despite these federal and state statutes, Metro has subjected Ms. Benson to different terms and conditions of employment because of her sex (female) and religion (Catholic).

167.    Ms. Benson belongs to a protected class under Title VII and Nev. Rev. Stat. § 613.330 by virtue of her sex and religion.

168.    At all times during her employment, Ms. Benson performed her job more than satisfactorily, as evidenced by consistently receiving positive feedback on her evaluations throughout her tenure at Metro.

169.    Metro's discriminatory and disparate treatment of Ms. Benson based on her gender includes but is not limited to the following: unwelcomed oral and written comments about her physical appearance, leering at her body, Sgt. Empey touching his genitals while talking to her, and Sgt. Empey making unwelcomed comments about her physical appearance to other officers, including her husband.  Ms. Benson was treated differently than similarly situated employees who do not belong to the same protected class. Upon information and belief, Sgt. Empey does not expose his male colleagues to unsolicited opinions on their looks,

MCLETCHIE LAW
ATTORNEYS AT LAW
701 EAST BRIDGER AVE., SUITE 520
LAS VEGAS, NV 89101
(702) 728-5300 (T) / (702) 425-8220 (F)
WWW.NVLITIGATION.COM

1    unwanted sexual advances, or invasions of their personal space.

2         170.    Metro's discriminatory and disparate treatment of Ms. Benson based on her

3    religion (Catholic) includes but is not limited to the following: repeated comments about her

4    not being LDS, comments regarding her perceived "unworthiness" because she is not LDS,

5    being forced to participate in LDS prayers during squad and community events, comments

6    by Sgt. Empey regarding becoming a "sister wife," and referring to Ms. Benson's Catholic

7    Church as the "Taco Bell" church.

8         171.    Ms. Benson suffered adverse employment actions which materially affected

9    her compensation, terms, conditions and/or privileges of employment, including but not

10   limited to the following: being subjected to unwanted and unwelcomed comments regarding

11   her physical appearance, unwanted and unwelcomed comments about her religion, and being

12   forced to participate in LDS prayers.

13        172.    As a direct and proximate cause of Metro's violation of Ms. Benson's rights

14   under Title VII and Nev. Rev. Stat. § 613.330, Ms. Benson suffered damages subject to an

15   amount to be proved at trial, including but not limited to: lost current and future PERS

16   pension income and benefits, current and future lost vacation and sick time, current and

17   future lost medical insurance benefits, and lost income such as her salary and raises she

18   would have received but-for being constructively discharged from Metro.

19        173.    Ms. Benson is entitled to punitive damages from Metro to deter Metro from

20   shirking its responsibility to maintain a discrimination-free workplace for its employees.

21        174.    It has been necessary for Ms. Benson to retain the services of attorneys and

22   therefore, pursuant to 42 U.S.C. § 2000e-5(k), she is entitled to recover reasonable costs and

23   attorney's fees.

24                          **SECOND CAUSE OF ACTION**
                 HOSTILE WORK ENVIRONMENT BASED ON GENDER AND RELIGION
25              PURSUANT TO 42 U.S.C. § 2000E AND NEV. REV. STAT. § 613.330
                             (AGAINST DEFENDANT METRO)
26

27        175.    Ms. Benson repeats and realleges Paragraphs 1 through 174 as though fully

28   set forth herein.

176.    Ms. Benson has the right to work in an environment free from gender-based or religion-based harassment.

177.    Sgt. Empey subjected Ms. Benson to repeated verbal and physical conduct because she is a woman, including but not limited to the following: unwelcomed oral and written comments about her physical appearance, leering at her body, touching his genitals while talking to her, and making unwelcomed comments about her physical appearance to other officers, including her husband.

178.    Ms. Benson was also subjected to repeated verbal conduct because she is a Catholic, including comments on her not being LDS, comments on her perceived "unworthiness" because she is not LDS, mandatory participation in LDS prayers during squad and community events, Sgt. Empey commenting on his desire to make Ms. Benson a "sister wife," and Sgt. Empey referring to Ms. Benson's Catholic Church as the "Taco Bell" church.

179.    Sgt. Empey's conduct toward Ms. Benson was unwelcome.

180.    Sgt. Empey's conduct was sufficiently severe and/or pervasive to alter the conditions of Ms. Benson's employment and create an abusive working environment.

181.    As a direct and proximate cause of Metro's violation of Ms. Benson's rights under Title VII and Nev. Rev. Stat. § 613.330, Ms. Benson suffered damages subject to an amount to be proved at trial.

182.    Ms. Benson is entitled to punitive damages from Metro to deter Metro from shirking its responsibility to maintain a non-hostile work environment for its employees.

183.    It has been necessary for Ms. Benson to retain the services of attorneys and therefore, pursuant to 42 U.S.C. § 2000e-5(k), she is entitled to recover reasonable costs and attorney's fees.

/ / /

/ / /

/ / /

/ / /

MCLETCHIE LAW
ATTORNEYS AT LAW
701 EAST BRIDGER AVE., SUITE 520
LAS VEGAS, NV 89101
(702) 728-5300 (T) / (702) 425-8220 (F)
WWW.NVLITIGATION.COM

### THIRD CAUSE OF ACTION
#### WRONGFUL TERMINATION BASED ON GENDER AND RELIGION
#### PURSUANT TO 42 U.S.C. § 2000E AND NEV. REV. STAT. § 613.330
#### (AGAINST DEFENDANT METRO)

184.    Ms. Benson repeats and realleges Paragraphs 1 through 183 as though fully set forth herein.

185.    Ms. Benson's resignation was induced by the actions of Sgt. Empey and workplace conditions that were violative of public policy—specifically, the public policies of not discriminating based on sex or religion, and of not retaliating against employees who engage in protected activities.

186.    A reasonable person in Ms. Benson's position at the time of her resignation would have also resigned because of the aggravated and intolerable employment actions and conditions perpetrated by Sgt. Empey.

187.    Metro had actual or constructive knowledge of the intolerable actions and conditions and their impact on Ms. Benson, as evidenced by multiple interviews with EDS and IAB detectives in which Ms. Benson and others shared these allegations against Sgt. Empey.

188.    The situation could have been remedied in one or several different ways, including but not limited to transferring Sgt. Empey to a different substation or disciplining Sgt. Empey in a sufficient manner to deter him from engaging in such tortious behavior.

189.    Upon information and belief, Metro has not imposed any discipline on Sgt. Empey for his inappropriate and unlawful behavior other than a contact report.

190.    Due to Metro's unwillingness to remedy Sgt. Empey's abusive behavior, Ms. Benson was left with no choice but to resign from her position, a constructive discharge.

191.    As a direct and proximate result of Metro's failure to remedy the toxic workspace Ms. Benson was exposed to, Ms. Benson suffered damages subject to an amount to be proved at trial.

192.    Ms. Benson is entitled to punitive damages from Metro to spur Metro into action regarding workplaces in which supervisors abuse their authority, retaliate against their subordinates, and discriminate based on sex and religion.

193.    It has been necessary for Ms. Benson to retain the services of attorneys and therefore, pursuant to 42 U.S.C. § 2000e-5(k), she is entitled to recover reasonable costs and attorney's fees.

### FOURTH CAUSE OF ACTION
##### RETALIATION FOR ENGAGING IN PROTECTED ACTIVITY
##### PURSUANT TO 42 U.S.C. § 2000E AND NEV. REV. STAT. § 613.330
##### (AGAINST DEFENDANT METRO)

194.    Ms. Benson repeats and realleges Paragraphs 1 through 193 as though fully set forth herein.

195.    Ms. Benson engaged in several protected activities while employed as a LEST at Metro, specifically serving as an employee witness in multiple internal investigations related to complaints made about Sgt. Empey's behavior.

196.    Ms. Benson was subjected to adverse employment action by the employer, specifically harassment at the hands of Sgt. Empey that made working at the Overton substation impossible, culminating in her constructive discharge.

197.    Ms. Benson's participation in protected activities was a motivating factor in subjecting Ms. Benson to repeated harassment and ultimately forcing her out of her job.

198.    As demonstrated by Sgt. Empey's abrupt change in how he and his colleagues treated Ms. Benson shortly after she engaged in protected activities, there is a causal link between Ms. Benson's protected activities and Metro's retaliatory actions.

199.    As a direct and proximate result of Metro's retaliatory actions, Ms. Benson suffered damages subject to an amount to be proved at trial.

200.    Ms. Benson is entitled to punitive damages from Metro to deter Metro from retaliating against its employees for exercising their rights.

201.    It has been necessary for Ms. Benson to retain the services of attorneys and therefore, pursuant to 42 U.S.C. § 2000e-5(k), she is entitled to recover reasonable costs and attorney's fees.

/ / /

/ / /

**FIFTH CAUSE OF ACTION**
<u>VIOLATION OF PROCEDURAL DUE PROCESS</u>
<u>PURSUANT TO 42 U.S.C. § 1983</u>
(AGAINST ALL DEFENDANTS)

202.    Ms. Benson repeats and realleges Paragraphs 1 through 201 as though fully set forth herein.

203.    Ms. Benson has constitutionally protected property interests in her continued employment at Metro, as well as in the pensions and other benefits she would be entitled to as an employee of Metro.

204.    By virtue of constructively discharging Ms. Benson, Metro violated those property interests.

205.    Metro and its employees acted under color of state law in depriving Ms. Benson of those property interests.

206.    The procedures pursuant to which Ms. Benson was constructively discharged were constitutionally insufficient under the Fourteenth Amendment.

207.    As a direct result of these unconstitutional violations of Ms. Benson's property rights, Ms. Benson is entitled to damages in an amount to be determined at trial.

208.    It has been necessary for Ms. Benson to retain the services of attorneys and therefore, pursuant to 42 U.S.C. § 1988(b), she is entitled to recover reasonable costs and attorney's fees.

**SIXTH CAUSE OF ACTION**
<u>NEGLIGENT SELECTION, TRAINING, SUPERVISION, AND/OR RETENTION</u>
<u>PURSUANT TO NEV. REV. STAT. § 41.130</u>
(AGAINST DEFENDANT METRO)

209.    Ms. Benson repeats and realleges Paragraphs 1 through 208 as though fully set forth herein.

210.    Metro had a duty to protect Ms. Benson from harm resulting from its continued employment and non-discipline of Sgt. Empey.

211.    Metro breached that duty by failing to ensure that Sgt. Empey was adequately trained, supervised, and disciplined to prevent harassing Ms. Benson based on sex and religion, and prevent retaliation against Ms. Benson for engaging in protected

27

activities.

212.    As a direct and proximate result of Metro's negligence, Ms. Benson suffered damages in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**
RIGHT TO PRIVACY - PUBLIC DISCLOSURE OF PRIVATE FACTS
(AGAINST DEFENDANT SGT. EMPEY)

213.    Ms. Benson repeats and realleges Paragraphs 1 through 212 as though fully set forth herein.

214.    Ms. Benson has a right to not have private facts about her publicly disclosed. *See, e.g.*, *Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1269 (9th Cir. 1998) ("The constitutionally protected privacy interest in avoiding disclosure of personal matters clearly encompasses medical information and its confidentiality. … One can think of few subject areas more personal and more likely to implicate privacy interests than that of one's health or genetic make-up.")

215.    Sgt. Empey intentional violated this right when, during the December 23, 2017 incident following Ms. Benson's automobile accident, he entered the ambulance where she was receiving medical treatment and publicly disclosed personal, private medical information related to Ms. Benson's worker's compensation claim for carpal tunnel syndrome.

216.    Sgt. Empey's public disclosure of Ms. Benson's personal, private medical information would be offensive and objectionable to a reasonable person of ordinary sensibilities, because a person who has filed a worker's compensation claim related to a medical condition has a reasonable expectation that information will be kept confidential.

217.    As a direct and proximate result of Sgt. Empey's public disclosure of private facts about Ms. Benson's medical history, Ms. Benson has suffered damages in an amount to be determined at trial.

/ / /

/ / /

/ / /

MCLETCHIE LAW
ATTORNEYS AT LAW
701 EAST BRIDGER AVE., SUITE 520
LAS VEGAS, NV 89101
(702) 728-5300 (T) / (702) 425-8220 (F)
WWW.NVLITIGATION.COM

**EIGHTH CAUSE OF ACTION**
RIGHT TO PRIVACY - INVASION OF PRIVACY
(AGAINST DEFENDANT SGT. EMPEY)

218.    Ms. Benson repeats and realleges Paragraphs 1 through 217 as though fully set forth herein.

219.    Ms. Benson has a reasonable expectation of privacy that her medical information would not be disclosed. Further, Ms. Benson had a reasonable expectation to receive medical treatment in privacy, without the intrusion of her supervisor, Sgt. Empey.

220.    Ms. Benson also has a reasonable expectation that she and her family can live in their home without being approached, contacted, or intimidated by Sgt. Empey or others acting on his behalf or at his direction.

221.    Ms. Benson's common law rights of privacy are well-founded in Nevada law, including, but not limited to, protection from the tort of intrusion upon a person's solitude or seclusion, the right to be let alone, and protection against the public disclosure of private facts and medical information.

222.    Sgt. Empey intentionally intruded upon Ms. Benson's expectation of privacy when he entered the ambulance where Ms. Benson was receiving medical treatment following her December 23, 2017 automobile accident despite Ms. Benson's explicit instructions to medical staff that she did not want Sgt. Empey to enter the ambulance.

223.    Sgt. Empey has also intentionally intruded upon Ms. Benson's expectation of privacy by permitting Officer Boss to send a pest control service to Ms. Benson's private residence without her knowledge or consent in an effort to intimidate Ms. Benson and her family.

224.    As a direct and proximate result of Sgt. Empey's invasions of Ms. Benson's privacy, Ms. Benson has suffered damages in an amount to be determined at trial.

**NINTH CAUSE OF ACTION**
RIGHT OF PRIVACY - INTRUSION UPON SECLUSION
(AGAINST DEFENDANT SGT. EMPEY)

225.    Ms. Benson repeats and re-alleges Paragraphs 1 through 224 as though fully set forth herein.

226.    Ms. Benson has a reasonable expectation that her medical information would not be disclosed. Further, Ms. Benson had reasonable expectation to receive medical treatment in privacy, without the intrusion of her supervisor, Sgt. Empey.

227.    Ms. Benson's common law rights of privacy are well-founded in Nevada law, including, but not limited to, protection from the tort of intrusion upon a person's solitude or seclusion, the right to be let alone, and protection against the public disclosure of private facts and medical information.

228.    Sgt. Empey intruded on Ms. Benson's right to seclusion when, on December 23, 2017, he entered the ambulance where Ms. Benson was receiving medical treatment, even after Ms. Benson had instructed the ambulance medical staff to not let Sgt. Empey enter the ambulance.

229.    Sgt. Empey has also intruded on and continues to intrude upon Ms. Benson's right to seclusion by repeatedly following her as she drives in and around the Overton/Logandale area conducting her personal business.

230.    Sgt. Empey has also intruded on Ms. Benson's right to seclusion by permitting an officer under his supervision to send a pest control service to Ms. Benson's private residence.

231.    As a direct and proximate result of Sgt. Empey's intrusion upon her seclusion, Ms. Benson has suffered damages in an amount to be determined at trial.

**TENTH CAUSE OF ACTION**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(AGAINST DEFENDANT SGT. EMPEY)**

232.    Ms. Benson repeats and re-alleges Paragraphs 1 through 231 as though fully set forth herein.

233.    Sgt. Empey intentionally or recklessly caused Ms. Benson to suffer severe emotional distress, as evidenced by his outrageous and unreasonable conduct of following her as she drives around the Logandale/Overton area and engaging in intimidating behaviors such as approaching Ms. Benson in a local gas station and staring at her without speaking.

234.    Sgt. Empey's extreme and outrageous conduct has caused and continues to

MCLETCHIE LAW
ATTORNEYS AT LAW
701 EAST BRIDGER AVE., SUITE 520
LAS VEGAS, NV 89101
(702) 728-5300 (T) / (702) 425-8220 (F)
WWW.NVLITIGATION.COM

cause Ms. Benson to be afraid of engaging in everyday activities such as driving around her community, shopping, and enjoying recreational activities.

235.    Sgt. Empey has conducted and continues to conduct himself with intentional or reckless disregard for inflicting emotional distress on Ms. Benson.

236.    As a result of Sgt. Empey's extreme and outrageous conduct, Ms. Benson has suffered, is suffering, and will continue to suffer damages in an amount subject to be determined at trial, and Ms. Benson is entitled to: declaratory relief against Sgt. Empey, attorney's fees and costs from Sgt. Empey, and monetary, compensatory, and punitive damages from Sgt. Empey.

### ELEVENTH CAUSE OF ACTION
#### FIRST AMENDMENT RETALIATION
#### PURSUANT TO 42 U.S.C. § 1983
#### (AGAINST DEFENDANT SGT. EMPEY)

237.    Ms. Benson repeats and re-alleges Paragraphs 1 through 236 as though fully set forth herein.

238.    The First Amendment to the United States Constitution shields public employees from employment retaliation for their protected speech activities.

239.    Ms. Benson engaged in protected speech activities when she testified on May 18, 2017 as a witness in an internal investigation pertaining to an ADA complaint her husband, Troy Benson, filed against Sgt. Empey.

240.    Ms. Benson was not acting within the scope of her official duties as a public employee when she testified as a witness in the internal investigation regarding Mr. Benson's ADA complaint against Sgt. Empey.

241.    Discrimination against persons with disabilities is a matter of public concern.

242.    Ms. Benson engaged in protected speech activities when she testified on September 26, 2017 as a witness in an internal investigation pertaining to allegations made by Officer Shannan Kelly that Sgt. Empey was stern, condescending, and made unreasonable demands of him during an August 8, 2017 meeting.

243.   Ms. Benson was not acting within the scope of her official duties as a public employee when she testified as a witness in the internal investigation regarding Officer Kelly's allegations against Sgt. Empey.

244.   Potential misconduct by government officials is a matter of public concern.

245.   Sgt. Empey subjected Ms. Benson to adverse employment action, including but not limited to changing procedures for handling traffic citations, giving Ms. Benson a negative performance evaluation, subjecting her to stalking and harassing behaviors, intentionally limiting officers' interactions with Ms. Benson, and failing to inform Ms. Benson whether he would approve requested medical leave.

246.   Upon information and belief, the adverse employment actions Sgt. Empey took against Ms. Benson were motivated by her protected speech as a witness in Metro's investigations of Mr. Benson's and Officer Kelly's complaints against Sgt. Empey.

247.   As a direct result of Sgt. Empey's violation of Ms. Benson's First Amendment rights, Ms. Benson is entitled to damages in an amount to be determined at trial.

248.   It has been necessary for Ms. Benson to retain the services of attorneys and therefore, pursuant to 42 U.S.C. § 1988(b), she is entitled to recover reasonable costs and attorney's fees.

### TWELFTH CAUSE OF ACTION
#### FIRST AMENDMENT RETALIATION
#### PURSUANT TO 42 U.S.C. § 1983
#### (AGAINST DEFENDANT SGT. EMPEY)

249.   Ms. Benson repeats and re-alleges Paragraphs 1 through 248 as though fully set forth herein.

250.   The First Amendment to the United States Constitution prohibits government officials from subjecting an individual to retaliatory actions for speaking out about a matter of public concern.

251.   On May 17, 2018, Ms. Benson engaged in protected speech activity when she filed a charge of discrimination based on sex and religion, as well as retaliation with the EEOC.

252.     Upon information and belief, Sgt. Empey is aware that Ms. Benson filed a charge of discrimination with the EEOC.

253.     Upon information and belief, Sgt. Empey has engaged in a campaign of retaliation against Ms. Benson for filing a charge of discrimination with the EEOC, including but not limited to sending a pest control service to her residence, following her as she drives through the Overton/Logandale area, and intentionally placing himself in close proximity to Ms. Benson and staring at her without speaking staring at her when he has encountered her in stores in the Logandale/Overton area.

254.     Sgt. Empey's bizarre and intimidating actions would chill or silence a person of ordinary firmness from future First Amendment activities.

255.     As a direct result of Sgt. Empey's violation of Ms. Benson's First Amendment rights, Ms. Benson is entitled to damages in an amount to be determined at trial.

256.     It has been necessary for Ms. Benson to retain the services of attorneys and therefore, pursuant to 42 U.S.C. § 1988(b), she is entitled to recover reasonable costs and attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Benson respectfully prays as follows:

a.     A trial by jury;

b.     A declaration that the acts and practices of Defendants are violations of state and federal laws prohibiting discrimination and retaliation;

c.     An award to Plaintiff Mary Benson in an amount equal to the wages, salary, and benefits which she would have earned but for the discriminatory and retaliatory treatment she was subjected to and making her whole for all economic losses suffered;

d.     An award requiring all Defendants to pay compensatory damages in an amount to be determined at trial;

e.     An award against the individual Defendants for punitive damages in an amount to be determined at trial sufficient to punish Defendants and deter them from engaging in this unlawful conduct;

f.      An award of an additional amount to account for any tax liability she may incur in relation to awards made herein;

g.      For prejudgment interest as allowed by law;

h.      For injunctive relief as detailed above, including restoration of the benefits to which she would be entitled had she not been constructively discharged from her position and instituting effective discrimination and retaliation prevention measures;

i.      An award of attorney's fees and costs under 42 U.S.C. § 1988(b) and 42 U.S.C. § 2000e-6(k); and

j.      Any further relief the Court deems appropriate.

DATED this 5th day of March, 2020.

/s/ Margaret A. McLetchie
MARGARET A. MCLETCHIE, Nevada Bar No. 10931
ALINA M. SHELL, Nevada Bar No. 11711
MCLETCHIE LAW
701 East Bridger Avenue, Suite 520
Las Vegas, NV 89101
Telephone: (702) 728-5300
Email: maggie@nvlitigation.com
*Counsel for Plaintiff Mary Benson*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this the 5th day of March, 2020, I did serve, via Case Management/Electronic Case Filing, a true and correct copy of the above and foregoing FIRST AMENDED COMPLAINT addressed to the following:

Nick D. Crosby
MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
Email: ncrosby@maclaw.com
*Attorney for LVMPD Defendants*


*/s/ Pharan Burchfield*
EMPLOYEE of McLetchie Law